No. 18,271.

James Bowland *v.* People of the State of Colorado.
(314 P. [2d] 685)

Decided August 19, 1957.

Mr. JOHN H. GATELY, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. JOHN W. PATTERSON, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE KNAUSS delivered the opinion of the Court.

PLAINTIFF in error, herein referred to as defendant, was convicted of the crime of aggravated robbery and sentenced to the state penitentiary. By writ of error he seeks reversal of the judgment of conviction.

Defendant was one of three defendants in the case. The remaining two, Weaver and Graniger, entered pleas of guilty. Three days before the trial of the case defendant's counsel moved that said Graniger be made

available at the trial, which motion was granted. Later the district attorney endorsed both Weaver and Graniger as witnesses for the People. This endorsement was made by order of court, and consented to by counsel for defendant.

The pertinent facts connected with the crime charged in the information as disclosed by the witnesses for the People show that one Strobridge, assistant manager of a Safeway store near Colorado Springs, in El Paso County, Colorado, arrived at the store about 7:45 A.M. on November 4, 1956, and after unlocking the door and entering the store was accosted by a masked man with a gun in his hand, who came up to Strobridge from inside the store and demanded that he open the cashier's booth and safe, which Strobridge did. The man with the gun put the money in a sack, and after inquiry as to how he might get out of the store without going through the front door, was led to the rear of the store, where he was joined by another man, also masked and also carrying a revolver. They thereupon locked Strobridge in a dairy cooler. The two men, after locking the assistant manager in the dairy cooler, left the premises by the rear door, where they entered an automobile in which a third man was sitting at the wheel, and all three drove rapidly away.

Meanwhile other employees of the store arrived preparatory to performing their duties for the day, and some of them suspecting that all was not well within the store, went to the rear of the premises where they saw the two men emerge from the rear door and enter the car and drive away. Strobridge testified that the two men who held him up being masked, he could not discern their facial characteristics. He described the first man as six feet tall and of slim build, and said he talked with a "southern accent"; the man at the rear of the store "as being quite a bit shorter than the first man; more on the stocky side." On the trial he was asked:

"Q. From the description of the man you observed in the store and from the defendant's physical build, are you able to make a comparison? A. Physical description — size, and so forth, fits very good. However, as I stated before, he was covered from the head to the shoulders so we made no facial identification at all."

In answer to another inquiry, he said: "His height and build correspond with the man that held me up."

Co-defendant Weaver, husband of defendant's sister, testified that he came to Colorado Springs from Vernon, Texas, on November 3, 1956, in a car owned by Graniger. Weaver drove the car with defendant in the front seat and Graniger in the rear seat of the automobile. Upon arrival at Colorado Springs "before midnight" on November 3, 1956, they drove out of town where defendant and Graniger put on additional clothes and drove to a spot back of the Safeway store, where Bowland (defendant) and Graniger got out of the car, instructing Weaver to return to the place between seven and eight o'clock in the morning. This Weaver did, and defendant and Graniger came out of the store, got in the car and all three returned to Vernon, Texas, where they arrived about ten P.M. on November 4th. Weaver testified that at Perrytown, Texas, Graniger and Bowland got out of the car and threw something away; that while enroute "somebody stuck some money in my pocket over my shoulder" while the car was in motion.

Graniger testified that he, Weaver and defendant came to Colorado Springs on November 3rd; that they came to Colorado Springs to rob a Safeway store; that they went to a Safeway store on South Tejon Street; that Bowland and he got out of the car, crossed the creek and entered the store by making a hole in the roof. Graniger said he waited in the rear of the building while defendant was at the front of the store; that following the holdup while he and defendant were going to the car, just before their departure on the return trip to Vernon, Texas, someone called to them and asked:

"Where we were going or where Strobridge was" and Graniger replied he would be out in a minute. This testimony was corroborated by Catherine Weber and John J. Cannella (the man who made the inquiry), both employees of the Safeway store.

Graniger further testified that as he got in the escape car he looked back and a young man who worked in the store was running up to the car "and then he proceeded to take my license, and we left." A deputy sheriff of El Paso County had the license number of the car.

The remainder of his testimony corroborated that of Weaver.

While enroute to Colorado Springs from Texas both Weaver and Graniger testified that a short distance west of Lamar, Colorado, they were stopped by a traffic officer and given a traffic violation ticket by the witness Rosenbaugh, who testified that he had given a ticket to Weaver near Lamar on November 3, 1956; that the car was owned by Graniger and driven by Weaver and that a third man was in the automobile. He further testified that the defendant "looks just about like" the third man who was in the car.

After the return of defendant, Weaver and Graniger to Colorado Springs, following their apprehension in Vernon, Texas, Graniger reenacted the crime in company with law enforcement officials, and recovered some of the tools used in gaining admission to the building. These had been hidden in the store and were disclosed to the officers by Graniger.

The defense offered was that of an alibi. Defendant's testimony in support of his alibi was corroborated by Marie Mundt, his twenty-year-old girl friend; Audrey Bowland, his brother, and Charles Thomas McKinney from Vernon, Texas, who had known defendant some three months.

After defendant testified that he was not in the state of Colorado on either the third or fourth of November, 1956, on cross-examination he was asked: "Have you

ever been convicted of a felony?" His counsel then said: "I will object, if your Honor please." The objection was overruled and defendant replied that he had been convicted of a felony, to-wit, robbery in California; that he was on parole, which would expire May 28th or May 29th, 1957.

It is urged for reversal that (1) the trial court should have directed a verdict of not guilty because Weaver and Graniger were accomplices and their testimony was not corroborated. (2) That it was error to allow the People to show defendant's prior conviction of a felony. (3) That the trial court erred in adding the names of the co-defendants Weaver and Graniger as witnesses. Following the trial, and in support of defendant's motion for a new trial, an affidavit signed by Graniger was filed in which he recanted his testimony given on the trial. There was also filed a document designated an affidavit, purporting to be signed by W. F. Weaver, but not dated or sworn to, in which the statement is made that defendant was not present at the time of the commission of the crime and had nothing to do with it.

It is conceded by defendant's counsel that the crime charged in the information was committed, but denies that defendant participated therein. Weaver and Graniger definitely connected not only themselves with the crime, but also identified and related in detail defendant's participation therein. The testimony of Strobridge, heretofore set out, corroborated in many particulars the testimony of Weaver and Graniger. We have above set forth in detail the evidence in corroboration of the testimony of Weaver and Graniger concerning the participation of defendant in the crime. Summarized, it establishes that defendant's physical appearance closely resembles that of the man who held up Strobridge and forced him to open the safe; that three men participated in the holdup, two of whom are positively identified. The officer who stopped them for a traffic violation enroute to Colorado Springs stated that the third man in

the car resembled defendant. This was sufficient to justify the jury in rejecting defendant's alibi and giving credence to the testimony of Weaver and Graniger.

██ It is the province of the jury to determine who is telling the truth. The People's witnesses placed defendant at the scene of the crime and two of them testified as to his participation in the robbery. While defendant's witnesses placed him in another state at the time of the commission of the crime, it is obvious that some of the witnesses were not telling the truth. There was competent evidence, as we have said, which lent credence to the testimony of Weaver and Graniger and the jury, under proper instructions, resolved the issue of alibi against defendant. We may here note that no objection appears of record of the instructions given by the learned trial judge, who was most liberal in permitting cross-examination of the witnesses Weaver and Graniger, and properly instructed the jury that the credibility of an accomplice is for the jury to pass upon. "However, great care and caution must be exercised by the jury in weighing and considering the testimony of an accomplice and the fact of his being an accomplice may be considered by you in weighing his testimony." The trial judge further instructed the jury that the fact that defendant, as well as Weaver and Graniger, had been previously convicted of crime was "competent as affecting the credibility of the defendant, James Bowland, as a witness, and the credibility of any other person so convicted as bearing upon the credibility of such persons as witnesses and for no other purpose."

We think the language in *Schechtel v. People,* 105 Colo. 513, 99 P. (2d) 968, is pertinent to the facts in the case before us:

" * * * The credibility of the witnesses was primarily a question for the jury. The case of the people was based, to a large extent, upon the uncorroborated testimony of accomplices. It is the law of our state that one may be convicted upon this character of testimony, but

to support the conviction it must be clear and convincing, must be received with great caution, and show guilt beyond a reasonable doubt. *Solander v. People,* 2 Colo. 48; *People v. Boutcher,* 89 Colo. 497, 4 P. (2d) 910. The trial judge by instructions, to which there was no objection, properly advised the jury upon this phase of the case, and in overruling the motion for a new trial, stated: 'While it was, perhaps, obvious to everyone connected with the case that some persons were not telling the truth, it finally resolved itself into a situation where it was the province of the jury to determine from those conflicting stories who was telling the truth. They arrived at their conclusion, and I do not think the Court has any right to substitute its judgment or its conclusions for that of the jury.' The defendant's second contention was properly rejected. There are, occasionally, criminal cases in which the evidence of the people is palpably incredible; totally discredited or absolutely impeached, and in which the trial or reviewing court properly refuses to sustain a conviction. A review of the record in this proceeding convinces us that this is not such a case."

See, also, *Miller v. People,* 92 Colo. 481, 22 P. (2d) 626, and *People v. Urso,* 129 Colo. 292, 269 P. (2d) 709.

A careful consideration of the record convinces us that the trial court properly overruled defendant's motion for a directed verdict of not guilty.

■ Where, as here, a defendant elects to become a witness in his own behalf in a criminal case, his credibility is open to question as is that of any other witness under the ordinary rules of evidence, including the right to examine him on the matter of previous felony convictions. A defendant in a criminal case, when he avails himself of the privilege of testifying in his own behalf, accepts whatever disadvantage results therefrom, and cannot claim prejudice by the introduction of evidence of the fact of a previous conviction or convictions, for he by taking the stand has waived any such right. *Eachus v.*

*People,* 124 Colo. 454, 238 P. (2d) 885; *Routa v. People,* 117 Colo. 564, 192 P. (2d) 436.

It was not error for the trial court to permit the endorsement of the names of Graniger and Weaver as witnesses for the People. When this application was made counsel for defendant stated: "I want the record straight. I am not objecting to the endorsement but I am not agreeing to their testifying." Counsel did not suggest or claim any element of surprise, and no continuance of the trial was asked for. In fact the record shows that prior to the date of the endorsement, defendant's counsel asked for and obtained an order that the People produce A. J. Graniger at the trial. Permission to endorse the name of a co-defendant on the information as a witness for the People is within the sound discretion of the trial court, and in the absence of a request for a continuance or a showing of surprise by the defendant it does not constitute error. *Grandbouche v. People,* 104 Colo. 175, 89 P. (2d) 577; *Roll v. People,* 132 Colo. 1, 284 P. (2d) 665; *Trujillo v. People,* 122 Colo. 436, 222 P. (2d) 775.

The leading case on recanting testimony is *Blass v. People,* 79 Colo. 555, 247 Pac. 177, in which it was said:

"The ground of the motion for a new trial was based entirely upon the recanting affidavit of Rocco, who was the principal witness on behalf of the people.

"The question for our determination is whether a recantation by a witness who testified on behalf of the people necessarily required the trial court to grant the defendant a new trial. We must answer the question in the negative. Such a rule would imperil the proper administration of justice. *People v. Shilitano,* 218 N.Y. 161, 112 N.E. 733, L.R.A. 1916F, 1044. The power to grant a new trial to a convicted felon would no longer rest in the sound discretion of the court, but with the witness who testified against him upon the trial.

"It cannot be said that, as a matter of law, a new trial should be granted whenever an important witness against the defendant shall make an affidavit that he

committed perjury in his testimony. If that were so, justice would be defeated in many grave cases. *People v. Tallmadge,* 114 Cal. 427, 46 Pac. 282.

" 'There is no form of proof so unreliable as recanting testimony. In the popular mind it is often regarded as of great importance. Those experienced in the administration of the criminal law know well its untrustworthy character.' *People v. Shilitano, supra.*

"We have many times announced that motions for new trial, based upon the ground of newly discovered evidence, are to be regarded with disfavor. *Edwards v. People,* 73 Colo. 377, 394, 215 Pac. 855. *Eachus v. People,* 77 Colo. 445, 448, 236 Pac. 1009. The granting or refusing of such a motion rests within the sound discretion of the court. *Wiley v. People,* 71 Colo. 449, 207 Pac. 478; *Eachus v. People, supra.*

"The testimony in the instant case was in sharp conflict. The credibility of the witnesses and the weight to be given the testimony of each witness was exclusively for the jury, and the jury it seems accepted the testimony of Rocco as true and rejected that of the alibi witnesses of the defendant as untrue. The judge presiding at the trial was in a position which gave him all of the opportunities of determining for himself the credibility of the witnesses and of the weight to be given their testimony, the same as each member of the jury. Great weight should be given to the opinion of the trial court upon a motion of this character.

"The trial judge having considered both of the affidavits of Rocco, one in support of the motion and the other counter thereto, in connection with all of the testimony and circumstances of the trial, we cannot disturb his decision thereon, in the absence of a clear showing of abuse of discretion.

"After a careful consideration, we do not discover any good reason for disturbing the discretion exercised by the court below in denying the motion for a new trial."

This case has been approved in *Ives v. People,* 86 Colo.

141, 278 Pac. 792; *Miller v. People,* 92 Colo. 481, 22 Pac. (2d) 626, and *Dockerty v. People,* 96 Colo. 338, 348, 44 P. (2d) 1013.

The distinguished trial judge was not moved by the change of heart of Graniger and denied the motion for a new trial. We observe no error in his ruling.

All pertinent matters of instructions to the jury were ably and fully included in the instructions given. We have considered the other matters urged for reversal and find them without merit.

The judgment is affirmed.